461 So.2d 739 (1984)
MONROE COUNTY ELECTRIC POWER ASSOCIATION and T & M Steel Erectors, Inc.
v.
Terry PACE.
No. 54519.
Supreme Court of Mississippi.
December 12, 1984.
*741 John W. Crowell, Gholson, Hicks & Nichols, Columbus, Michael D. Greer, Mitchell, McNutt, Bush, Lagrone & Sams, Tupelo, for appellants.
David W. Houston, III, Houston, Chamberlin & Houston, Aberdeen, for appellee.
Before PATTERSON, C.J., and DAN M. LEE and ROBERTSON, JJ.
DAN M. LEE, Justice, for the Court:

I.
This is an appeal from the Circuit Court of Monroe County wherein the jury returned a verdict in favor of the appellee, Terry Pace, against the appellants, Monroe County Electric Power Association and T & M Steel Erectors, Inc. This suit was initiated by Pace when he filed a declaration on May 1, 1980, which alleged that he was injured as the result of the negligence of the appellees and a third defendant, Mitchell Engineering. Following the trial, the circuit judge granted a directed verdict to Mitchell Engineering.
Pace was injured while at work on November 10, 1979. His injury occurred as the result of coming into contact with a high voltage "feeder" power line which was strung over the roof of a building Pace was working on. Briefly, Pace argued that T & M Steel Erectors, Inc. (T & M) was negligent for erecting the building directly under the high tension wires so as to leave the wires no more than approximately four feet over the roof of the building. Pace also alleged that Monroe County Electric Power Association (The Power Company) was negligent in failing to inspect the wires, become aware of the danger, and remedy that situation.
The jury returned a verdict for Pace against the two appellees and assessed his damages at $75,000. A judgment was entered accordingly. From that verdict and judgment the appellees bring this appeal.

II. THE FACTS
On November 10, 1979, Terry Pace was a 17-year-old laborer for Hamilton Electric Gin. When Pace arrived at work that morning he had been working for Hamilton Electric Gin six weeks. Pace testified that soon after arriving at work he was told to get a ladder and climb onto the roof of the molt press shed and begin cleaning out a vent on top of that roof. Pace had never been on the roof before. Pace worked with Carl Lee and Jimmy Revord to clean wet cotton lint out of the vent. Lee and Revord were pulling the lint out of the vent and Pace was scooping it up in an aluminum scoop, taking it to the side of the building and throwing it over. The roof was covered with approximately three inches of damp cotton lint. As Pace was carrying a scoop full of the cotton lint to the side of the roof, he accidentally hit a high voltage power line which ran across a section of the roof. The next thing Pace remembered was being carried off the roof in great pain. Pace testified that he was unaware of the presence of the high voltage lines and that no one had warned him about them.
There is no need to detail the full extent of Pace's injuries. He suffered severe burns on his neck, right shoulder and both feet. Portions of both feet had to be amputated. In addition to the extreme pain from the initial injury, Pace had to undergo painful whirlpool treatments twice a day for approximately twenty-five days. Pace's recuperation and rehabilitation were lengthy. He has a twenty-eight percent *742 disability of his feet and legs and continues to complain of a loss of balance, inability to run, difficulty in walking up an incline and the inability to stand for longer than fifteen to twenty minutes.
Marlis E. Mink, general supervisor for the hamilton Electric Gin, testified that the molt press shed was built in June, 1977. Mink stated that Robert Parham, superintendent of Amory Cotton Oil Company and Mink's supervisor, had initiated the building of the molt press shed. According to Mink, Parham contacted Mitchell Engineering, who drew up the plans for the shed. The plans and building materials were purchased from Mitchell Engineering but the assembly of the building was contracted to T & M.
Mink testified when the T & M construction team arrived on the scene, Hamilton Electric Gin had already caused a concrete foundation, complete with anchor bolts, to be poured. As per Parham's design, the molt press shed was to be constructed next to an existing building so as to use the wall of the existing building as one of the walls of the press shed. This design also required that the molt press shed be erected directly under high voltage "feeder lines" which brought electricity from the power lines to the Gin's transformers, located behind the molt press shed.
Mink further testified that when the T & M construction team arrived they wanted to know if the high voltage feeder wires running over the construction site were hot. Mink testified that Parham told them no, that the energy to those lines had been cut off at the fuses on the pole.
Mink added that these high voltage lines leading to the Gin were energized every Fall and de-energized every Spring. In other words, the high voltage wires carried electricity only during the ginning season. The Power Company had always been responsible for turning the electricity on and off.
After T & M erected the shed, it became necessary to install a vent on the roof. Installation of the vent was accomplished by employees of Hamilton Electric Gin and the services of T & M were not availed of in that project. Following the installation of the vent, representatives from T & M were twice called back to the Gin to repair leaks in the shed they had erected. This required that T & M employees be on the roof of the molt press shed where the installation of the vent was obvious.
Prior to the construction of the molt press shed, the Gin had requested that The Power Company de-energize the high tension lines and the 220 line so that Hamilton could raise the weatherhead on its existing building. The weatherhead is the pipe to which the 220 line is directed from its source at the utility company's pole. The line went down the weatherhead to the 220 meter. Because Hamilton intended to build the molt press shed, he needed to raise the weatherhead so that the 220 line would not be in the way. Representatives from Monroe Electric came out and cut the power to that line on and off so that this work could be completed.
Mink was responsible for having sent Pace up on the roof to clean out the vent. He testified that he did not remember giving Pace any special warning regarding the power lines other than a general warning sometime earlier to be careful.
Interrogatories propounded to The Power Company from Mitchell Engineering and Terry Pace were introduced into evidence. Among the information contained in those interrogatories is the following: The power lines along the road on which Hamilton Electric Gin sat were erected in 1939. The lines carried 12,500 volts. The feeder lines to the Gin were erected in 1964 and also carried 12,500 volts. Monroe County Electric Power Association retained ownership of the main lines and feeder lines. From the roof of the molt press shed to the high voltage feeder wires was a distance of forty-two inches. The Power Company energized and de-energized the lines once per year. There was no warning on any of the lines. The Power Company had not inspected the lines after the molt press shed was built. The National Electrical Safety Code regulates the erection and maintenance *743 of electrical wires in Monroe County and sets the standards by which the Monroe County Electric Power Association operates. The lines in question did not comply with that Code. At Hamilton's request The Power Company had raised the 220 volt line which ran alongside the 12,500 volt feeder lines. Employees and the operating superintendent of the Monroe County Electric Power Association observed the molt press shed; however, none observed the high tension wires running over it.
Robert Parham, superintendent of the Amory Cotton Oil Company and general manager of the Hamilton Electric Gin, testified for Terry Pace. Parham stated that he was responsible for purchasing the molt press shed, having it erected and installing the molt press. Parham testified that Mitchell Engineering gave him a foundation plan and poured the foundation which included anchor bolt settings to attach the shed to the foundation.
Parham testified that Buck Tieg, a sales representative for Mitchell Engineering, came to the Gin site to discuss the plans and erection of the molt shed. Tieg asked Parham if the high tension lines running over the construction site were hot. Parham assured him that the lines had been de-energized. At Tieg's suggestion, Parham hired T & M to do the actual construction of the building after Mitchell furnished the supplies.
Parham stated that the T & M representative, James Herrington, asked him if the power to the high voltage wires was on. As he had done for Tieg, Parham assured Herrington that the lines had been de-energized for the construction of the building.
Parham stated that he never did call The Power Company and ask them to move the feeder lines. He also admitted that the vent which was installed on top of the molt press shed was not in the original plans as drawn up by Mitchell Engineering.
Damon Wall, the assistant dean of engineering and an associate professor of electrical engineering at the University of Mississippi, was called by Terry Pace as an expert witness. Wall testified that he was familiar with the National Electrical Safety Code and that that Code set standards intended to promote safety and govern the conduct of those dealing with electricity. Wall further testified that Section 23-4 of the National Electrical Safety Code required a minimum clearance of ten feet for the safe operation of high voltage lines. Wall was of the opinion that the high voltage wires in question constituted an unreasonably dangerous condition for persons required to work on the roof. He stated that Section 214 of the National Electrical Safety Code required the inspection, reporting and repair of dangerous lines. That section reads:
Lines and equipment shall comply with these safety rules when placed in service.
According to Wall this provision of the Safety Code was violated by The Power Company each time it re-energized the high voltage lines following the construction of the molt press shed. Wall testified that in his opinion the Code required that all lines be checked before they were put back in service. Wall further stated that he was familiar with the provisions of the National Electrical Safety Code Section 214(a)(2) which reads:
Lines and equipment shall be inspected from time to time at such intervals as experience has been shown to be necessary.
And subsection (a)(5) which reads:
Lines and equipment known to be defective so as to endanger lives or property shall be promptly repaired, disconnected or isolated.
James Herrington, the President of T & M, testified that when they erected the molt press shed they used precut materials which had been fabricated at Mitchell Engineering. Herrington testified that he and his employees had encountered high tension lines over their construction area on previous occasions but that they had never removed them. Herrington stated that he saw the high tension wires prior to the erection of the molt press shed but that he was unaware that the erection of the building *744 brought its roof to within less than eight feet from those wires. He admitted that if high voltage lines interfere with his work he generally asks the owner of the wires to move them. He stated that he depends on the owner of the lines to take care of any clearance problems. According to Herrington, this was the custom and practice in the erection industry.
Herrington testified that he never knew the molt press shed's purpose or that a vent would be installed on its roof. He admitted being on the roof of the building at least once during its construction and could have seen the roof's proximity to the power lines. Herrington denied that he had any reason to believe that access would ever be required to the roof's building.
Kenneth Miller, the operating superintendent at The Power Company, testified that the high tension wires measure forty-two inches above the roof of the building. He admitted that representatives from The Power Company read electric meters at the Gin on a monthly basis. The Gin had two electric meters, one for the high tension wires which were activated only during the ginning season, and another for the 220 line which ran power to the Gin's office year-round. The 220 meter was read on a monthly basis throughout the year and the high voltage meter was read once a month during the period the lines were energized.
Miller testified that all of the meter readers for The Power Company are trained to report any dangers or dangerous conditions they observe. He further stated that the location of the high tension wires in such close proximity to the building constituted a dangerous condition and that had his workers observed those lines, they would have moved them. He stated his workers tried to observe the lines but he could offer no explanation for why the dangerous condition was not observed and reported at least once during the twenty-nine times representatives of The Power Company came to the premises of the Gin and read the electric meters between the date of the erection of the building and that of the accident. Miller further testified that The Power Company had a formal policy of inspection of all lines once every three years. He admitted that it was no difficult task to observe the lines in question.
Frank Finney was called as a witness for The Power Company. Finney was a serviceman who read the Hamilton Electric Gin meters. Up until April, 1977, two months before the erection of the molt press shed, it was part of Finney's job to routinely check the condition of the lines leading to the transformers and meters at the Gin. He stated that all servicemen are instructed to make visual inspection of power lines and to report any problems or dangerous conditions. Finney admitted that he was in the Hamilton Electric Gin area after the erection of the molt press shed but that he never noticed that the new building was under high tension lines. He stated that had he seen the condition, he would have reported it.
James K. Benton was also a serviceman for the Monroe County Electric Power Association. Benton was on hand the day Hamilton Electric Gin raised the weatherhead. Benton was responsible for de-energizing and then reenergizing the power lines following the raising of the weatherhead. This occurred in the Spring of 1977, prior to the erection of the molt press shed. Benton testified that no one mentioned to him there was any intention to build the shed.
Benton further testified that from the Spring of 1977 through the date of the accident, he inspected power lines in the Hamilton area although he could not specifically recall inspecting the lines at the Gin. Benton was in the area at least once a week and he was certain that other representatives of The Power Company were in the same area doing the same thing. Benton stated that had he observed the lines he would have reported their condition because they unquestionably constituted a danger. Benton later testified that he might have seen the molt press shed but did not get close enough to "observe" it. Benton affirmed that The Power Company meter readers were at the Gin at least once *745 a month and that they had a duty to inspect the condition of the wires.
Huel Riddle, a serviceman and meter reader for The Power Company, testified that he read the electric meters at the Gin from 1977 through 1980. He was also present when the weatherhead at the Gin was raised. Riddle testified that he never observed any problem with the high tension lines. He stated that he was in the area every day and although the lines were not difficult to see, he simply failed to observe them. Although Riddle admitted that he had a duty to inspect those wires, he testified that he failed to inspect the transformers at the Gin for a period of two and one-half years. Riddle stated that he energized and de-energized the power once a year for the Gin from 1977 through 1980. He admitted that he never did perform an actual inspection of the wires other than to simply look up at them. Riddle stated that if he turned the power on and there wasn't an immediate short or fire, he considered the lines free of defect. Although he had earlier denied observing a problem with the lines, Riddle admitted seeing their condition as it related to the proximity of the molt press shed. He further acknowledged that he failed to report that condition.
On the above detailed evidence the jury deliberated and returned a verdict for Pace.

III. THE LAW
Because there are two appellants in this cause, some of the assignments of error overlap. We have set them out separately except where they overlap.

A.

MONROE COUNTY ELECTRIC POWER ASSOCIATION ASSIGNMENT OF ERROR NO. I

THE REFUSAL OF INSTRUCTION D-MC-13
The Power Company argues that the court erred in failing to grant Instruction D-MC-13. The circuit court refused to grant this instruction on the ground that it was repetitive. The requested instruction reads:
You are instructed that it is the law in Mississippi that no person, firm, partnership, or corporation shall require or permit any employee to enter upon any building or other premises and there engage in any operation or function whatsoever where to do so would bring such employee within eight (8) feet of a high voltage overhead line. You are instructed that as a matter of law this law was violated by the employer of Terry Pace when it required Terry Pace to go up on the roof and perform certain work which would reasonably require him to get within eight (8) feet of a high voltage overhead line. Such conduct on the part of the employer of Terry Pace is negligence and if you believe such negligence was the sole proximate cause of the injuries suffered by Terry Pace, then it shall be your sworn duty to return a verdict for Monroe County Electric Power Association.
The thrust of The Power Company's argument is that § 45-15-3 of the Mississippi Code Annotated (1972) was not adequately included in any of the instructions and that the violation of this safety statute was negligence per se, entitling The Power Company to an instruction to that effect. We are of the opinion that D-MC-13 embodies the principles of § 45-15-3 and instructs the jury that if those principles are violated, such violation is negligence per se.
In White v. Mississippi Power & Light Co., 196 So.2d 343 (Miss. 1967), this Court held that the violation of the statutory predecessor to § 45-15-3, although negligence, did not act to insulate the power company from its own negligence in failing to exercise due care in properly constructing its lines and maintaining and inspecting them so as to keep them in a safe condition.
In Mississippi Power & Light Co. v. Walters, 248 Miss. 206, 158 So.2d 2 (1963), this Court held that a power company could be held liable where it either knew, or in the exercise of reasonable care, should have known, of a dangerous situation *746 which existed in relation to its power lines. The Court relied on the fact of the power company's continued maintenance of its uninsulated high tension wires at the site and its duty to maintain those wires in a condition so that there was no reasonable cause to anticipate that people would be exposed to danger because of them. We there held:
The principal basis for determining liability of a power company for injuries resulting from contact between its wires and a crane or other moving machinery is the foreseeability of a situation arising which might lead to such injuries. If a reasonably prudent person in the position of the defendant should have anticipated dangers to others from its installations, the defendant may be held liable.
248 Miss. at 243, 158 So.2d at 16.
The opinion went on to state that:
It is well settled by the decisions of this Court that there may be more than one proximate cause of an injury; and that, if the appellant's negligence proximately contributed to the injury, the appellant is liable even though its negligence was not the sole proximate cause of the injury.
248 Miss. at 252, 158 So.2d at 20.
We are of the opinion that these principles of law and those principles embodied in Instruction D-MC-13 were adequately presented to the jury. Numerous other instructions inform the jury that if the sole proximate cause of Pace's injuries was attributable to anyone other than The Power Company, then The Power Company must be absolved of liability.
We briefly set forth the essence of those instructions:
I. D-MC-1. This instruction tells the jury that under the law in Mississippi an employer has an absolute duty to provide a safe place for its employees to work. It tells the jury that if Terry Pace was assigned to work in an unsafe place, then his employer was negligent. It further tells the jury that they find that Pace's employer's negligence was the sole proximate cause of the accident, then it was their sworn duty to return a verdict for the defendants.
II. D-MC-3. This instruction informs the jury that the Amory Cotton Oil Company had a duty to keep Terry Pace's working premises in a reasonably safe and suitable condition or, in the alternative, warn him of any defects or dangers. The instruction further informs the jury that if Amory Cotton Oil Company failed to do this, it was guilty of negligence, and if that negligence was the sole proximate cause of Pace's injuries, it was the jury's duty to return a verdict for the defendants.
III. D-MC-4A. This instruction set forth the essential provisions of § 45-15-3 Miss. Code Ann. (Miss. 1972). It informed the jury that if either Pace's employer or T & M had violated the provisions of that statute by erecting a building so as to place Pace within eight feet of the high voltage wires that conduct was negligence and if that negligence was the sole proximate cause of Pace's injuries, then it was the duty of the jury to return a verdict for the power company.
IV. D-T-13. This instruction told the jury that if Pace's employers were negligent in allowing him to go onto the roof and that if such negligence was the sole proximate cause of Pace's injuries or was combined with the negligence of Pace or the power company, then it was the duty of the jury to return a verdict of T & M.
There having been ample instruction on this point, we are of the opinion that the circuit court was correct in refusing to grant D-MC-13 as repetitive.

B.

MONROE COUNTY ELECTRIC POWER ASSOCIATION ASSIGNMENT OF ERROR NO. II.

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN GRANTING INSTRUCTION P-20?
Instruction P-20, given at the request of Pace, reads as follows:
The Court instructs the jury that if you find from a preponderance of the *747 evidence that the Defendant, Monroe County Electric Power Association, violated the standards provided by the National Electrical Safety Code in maintaining and operating its overhead high voltage wires less than ten feet in height from the roof of the molt press shed, when it had knowledge of said condition or in the exercise of reasonable care should have known of the condition then the Defendant, Monroe County Electric Power Association, is guilty of negligence per se, and if you believe from a preponderance of the evidence that such negligence was the proximate cause or a proximate contributing cause of the injuries to Plaintiff, then you should return a verdict for the Plaintiff.
The Power Company's principle argument here is that P-20 was defective because there was no specific reference to the National Electrical Safety Code provisions which were violated and that the instruction peremptorily instructed that The Power Company was negligent as a matter of law. The Power Company also argues that the use of Latin idioms in an instruction constitutes reversible error.
As to its peremptory nature, a reading of the instruction defeats this assertion. The instruction obviously requires that the violation of the National Electrical Safety Code standards must either have been known or should have been known in the exercise of reasonable care. Therefore, the instruction was not peremptory as it allowed the jury to determine whether the violations of the National Electrical Safety Code were known or should have been known in the exercise of reasonable care by The Power Company.
As to the argument that the instruction is vague and overbroad because it does not define which of the National Electrical Safety Code standards were violated, the only provisions of that Code which were relevant for the jury's consideration were those referred to by the expert witness, Damon Wall. Wall specifically referred to provisions which require the inspection of electrical lines and replacement of defective lines prior to energizing those lines. We are of the opinion that because reference at trial was limited to specific provisions of the National Electrical Safety Code those were the only provisions which the instruction could have referred to. We are further of the opinion that this is the only reasonable interpretation the jury could have given P-20 and that the instruction was therefore not confusingly vague.
As to the use of Latin idioms, it is true that in Illinois Central Railroad Company v. Pigott, 254 Miss. 429, 181 So.2d 144 (1965), this Court cautioned attorneys throughout the state that Latin idioms should not be incorporated into jury instructions. Regardless, the Court's decision to reverse that cause was not founded in the use of Latin idioms, rather it found that the substance of the instruction was error. Acknowledging that it is certainly preferred that Latin idioms not be used in instructions, we cannot say that the use of the term "negligence per se" as it appears in Instruction P-20 constituted reversible error.

C.

T & M'S ASSIGNMENT OF ERROR NO. I

IS THE VERDICT REVERSIBLE BECAUSE AN EMPLOYER HAS A NON-DELEGABLE DUTY TO SAFEGUARD HIS EMPLOYEES BY PROVIDING THEM WITH A SAFE PLACE TO WORK.
Unquestionably T & M is correct when it asserts that an employer owes its employees the nondelegable duty of providing its employees with a safe place to work. Finkbine Lumber Co. v. Cunningham, 101 Miss. 292, 57 So. 916 (1911). The downfall of this argument is not that it is incorrect; rather, it is incomplete. The jury was correctly instructed that Terry Pace's employer owed him a duty to provide him with a safe place to work. They were instructed that if Pace's employer's negligence was the sole proximate cause of his injuries then they must return a verdict *748 for the defendants. Obviously, the jury must have believed that to whatever degree Hamilton Electric Gin was negligent, it was not the sole proximate cause of Pace's injuries. As stated above, it is a well settled rule in this state that there may be more than one proximate cause of an injury. Therefore, although the jury may have determined that Hamilton Electric Gin was negligent, that does not prohibit them from finding that T & M's negligence was a proximate cause of Pace's injuries. Mississippi Power & Light Co. v. Walters, supra. We believe that the jury was correctly instructed on these points and, as they are the ultimate finders of fact, we find no merit to this assignment of error.

D.

T & M'S ASSIGNMENT OF ERROR NO. II

IS A CONTRACTOR WHO COMPLETES A JOB ACCORDING TO THE PLANS AND SPECIFICATIONS OF THE OWNER LIABLE TO THE OWNER'S EMPLOYEE WHO IS INJURED TWO YEARS AFTER THE PROJECT IS ACCEPTED BY THE OWNER WITH FULL KNOWLEDGE OF ANY DANGEROUS CONDITIONS THAT MIGHT EXIST ON THE PREMISES?
T & M correctly argues that the general rule, and the rule in this state, is that where a contractor has turned over work and it has been accepted by the proprietor, the contractor incurs no further liability to third parties, by reason of the condition of the work and the liability, if any, for maintaining or using the work in its defective condition is shifted to the proprietor. Herring v. Planters Lumber Co., 169 Miss. 327, 153 So. 164 (1934); City of Vicksburg v. Holmes, 106 Miss. 234, 63 So. 454 (1913). While Pace acknowledges that this is the rule, he argues that this case falls within one of the well recognized exceptions to that rule, i.e., where the contractor turns the work over "in a manner so negligently defective as to be imminently dangerous to third persons." Holmes v. T.M. Strider & Co., 186 Miss. 380, 189 So. 518 (1939); Herring, supra. The issue then boils down to whether the building, at the time it was turned over to Hamilton Electric Gin was so negligently defective as to be imminently dangerous to third persons. This was a question of fact for the jury upon which they were amply instructed. We are of the opinion that having been properly instructed, there was sufficient evidence for the jury to find both that T & M turned the building over in a condition so negligently defective as to be imminently dangerous to third persons and further that an injury of this type was entirely foreseeable. We therefore find no merit to this assignment of error.

E.

T & M'S ASSIGNMENT OF ERROR NO. III.

DOES MISS. CODE ANN. § 45-15-3 IMPOSE LIABILITY UPON A CONTRACTOR FOR INJURIES TO THIRD PARTIES WHICH OCCUR AFTER THE CONTRACTOR'S WORK HAS BEEN COMPLETED?
Here, we are asked to decide whether § 45-15-3 Miss. Code Ann. (1972) is designed only to protect workers performing activities in close proximity to high power lines at the time they are performing that activity. In other words, was the statute designed to protect T & M's workers who were constructing the building or, did it also have the purpose of protecting all other persons from the creation of a dangerous condition as the result of the erection of the building? In order to answer this question, it is necessary to look at the statute:
No person shall enter upon any land, building or other premises and there engage in any excavation, demolition, construction, repair or other operation or function whatsoever, nor erect, install, operate or store in or upon any land, building, or other premises any tools, machinery, equipment, materials, structures, *749 apparatus or other thing whatsoever were to do so would bring such person or such thing within eight (8) feet of a high voltage overhead line; provided the prohibitions contained in this section shall not apply in a case where the dangers of accidental contact with such high voltage overhead line have been effectively guarded against by (a) the erection of barriers to prevent physical contact with such high voltage overhead line, or (b) such high voltage overhead line has been de-energized and, where necessary, grounded. Provided, however, nothing herein shall be construed or shall operate to impose upon any person the duty or obligation to effect the precautionary measures described in (a) or (b) next above, at his or its expense, nor shall such person be obligated to de-energize or ground such line or lines where service to the public would be substantially interfered with, or the health, safety or welfare of the public would thereby be endangered.
Section 45-15-3 Miss. Code Ann. (1972)
T & M takes the position that this statute is intended only to protect workers engaged in the activities enumerated therein. They argue that it was not designed as ongoing protection for the general public once the enumerated activities are completed. This is an interesting argument and one which has not yet been addressed by this Court. The cases applying the statute have all applied it to situations where the injured parties were engaged in the enumerated activities. See White v. Mississippi Power & Light, 196 So.2d 343 (Miss. 1967); Mississippi Power & Light Co. v. Walters, 248 Miss. 206, 158 So.2d 2 (1963).
The construction of the statute urged by T & M requires that its literal wording be ignored. The statute prohibits the erection, installation or operation of any tools, machinery, equipment, materials, structures, apparatus or other thing whatsoever where to do so would bring such person or such thing within eight feet of a high voltage overhead line. Clearly then the statute prohibits the erection of a building where such erection would place the building within eight feet of a high voltage line. Because the purpose of the statute is to insure public safety, an interpretation as narrow as that sought by T & M would be illogical. Therefore, this argument has no merit.

F.

MONROE COUNTY ELECTRIC POWER ASSOCIATION'S ASSIGNMENT OF ERROR NO. III AND T & M'S ASSIGNMENT OF ERROR NO. IV

DID THE LOWER COURT ERR IN FAILING TO REFORM THE JURY'S INITIAL VERDICT?
After retiring to deliberate, the jury initially returned a bifurcated verdict wherein it assessed separate damages against T & M and The Power Company. That verdict assessed damages against The Power Company in the amount of $45,000 and against T & M in the amount of $18,000 for a total of $63,000. The court instructed the jury that they were to redraft their verdict so as to reflect a single award. The jury then sent a verbal inquiry via the bailiff as to whether they could increase the amount of damages. The jury was instructed that they would have to write out their inquiry and, rather than doing so, they returned a single verdict for $75,000.
No one argues that the trial court was incorrect in refusing to accept separate verdicts. Nason v. Sanders, 227 So.2d 275 (Miss. 1969). Section 11-7-159 Miss. Code Ann. (1972) states:
If the verdict is informal or defective, the court may direct it to be reformed at the bar. Where there has been a manifest miscalculation of interest, the court may direct a computation thereof at the bar, and the verdict may, if the jury assent thereto, be reformed in accordance with such computation.
In Gillespie v. Olive Branch Building & Lumber Co., 174 Miss. 154, 164 So. 42 (1935), the jury returned separate verdicts against joint tort-feasors. The jury assessed damages against one of the defendants *750 at $4,000 and against another at $3,500. The court entered a judgment for $4,000. This Court reversed as to damages and held: "What the court below should have done ... was to direct the jury to return to its room, clear up its verdict, and render one in accordance with the court's instructions." 174 Miss. at 162, 164 So. at 43.
In other cases this Court has directed different outcomes. In Southland Broadcasting Co. v. Tracy, 210 Miss. 836, 50 So.2d 572 (1951), the jury returned a verdict against one defendant in the amount of $20,000 and against another in the amount of $5,000. When the form of the verdict was objected to the jurors promptly replied that they had prepared an alternative verdict against both defendants in the sum of $25,000. This Court affirmed the trial court's decision to accept the second award.
In Mississippi Central Railroad Co. v. Roberts, 173 Miss. 487, 160 So. 604 (1935), the jury returned two verdicts, one against the first defendant for $8,500 and the other against a second defendant for $1,000. The court directed the jury to retire for further deliberation. The jury soon returned with a verdict against both defendants for $9,500. In approving that action, this Court held:
From the earliest times in the state's history, it has been the approved practice, when the verdict is not in legal form, or is ambiguous, or imperfect upon its face or is not responsive to the issues, or is beyond the power of the jury in material respects apparent to the face of the verdict or verdicts, to require the jury to retire and to return a verdict which in form and effect will be such as the law allows and contemplates as a perfected return in all its formal parts.
173 Miss. at 506, 160 So. at 607.
Because § 11-7-159 does not require that a verdict be reformed at the bar, it is merely directory. We are of the opinion that the trial court did not err in directing the jury to retire to the jury room and reform its verdict. Because no verdict had been accepted, and no judgment entered, we are of the further opinion that the jury's decision to increase the amount of damages as awarded does not constitute grounds for reversal.

G.

MONROE COUNTY POWER ASSOCIATION ASSIGNMENT OF ERROR NO. IV.

DID THE TRIAL COURT ERR IN REFUSING TO PERMIT WITNESS HUGH OWENS TO BE COMPLETELY EXAMINED FOR PURPOSES OF FUTURE POSSIBLE IMPEACHMENT?
In this assignment of error The Power Company argues that it was not allowed to impeach the testimony of Hugh Owens, the former foreman of T & M, in front of the jury. Here The Power Company is arguing that it wanted to impeach Owens' credibility because, although he had testified that T & M had never moved existing power lines before beginning construction, he admitted that on previous occasions T & M had destroyed dilapidated power lines before erecting some projects. The Power Company argues that it would have introduced the testimony of Mr. Miller to show that in a parking lot on the previous day, Mr. Owens had admitted that T & M had relocated power lines in the past when the owner had failed to do so. We have reviewed the proffered testimony and are of the opinion that the circuit judge was correct in his ruling that the testimony of Mr. Owens was not relevant to the issue of the movement of live power lines. We therefore find no merit in this assignment of error.

H.

T & M'S ASSIGNMENT OF ERROR NO. V.

WAS THE NEGLIGENCE OF PACE'S EMPLOYERS A SUPERCEDING INTERVENING CAUSE OF HIS INJURIES?
This assignment of error tests the jury's determination as to proximate *751 cause. As reflected in the above discussion, the jury was instructed that in order to find against T & M it must find that T & M's negligence was a proximate cause of Pace's injuries. As previously stated, an accident may have more than one proximate cause. In Solomon v. Continental Baking Company, 172 Miss. 388, 160 So. 732 (1935), this Court wrote:
[W]here an act of negligence is a substantial factor in bringing about an injury, it does not cease to be a legal and proximate cause thereof because of the intervention of a subsequent act of negligence of another which contributed to the injury, if the prior act of negligence is still operating and the injury inflicted is not different in kind from that which would have resulted from the prior act.
172 Miss. at 393, 160 So. at 733.
If the jury found that T & M's actions were a proximate cause of Pace's injuries they could well have found that the negligence in constructing the building constituted an ongoing dangerous condition. Therefore, having been adequately instructed and, having a plausible factual scenario on which to make its finding, the decision of the jury as to whether T & M was negligent and whether that negligence was the proximate cause of Pace's injuries will not be overruled by this Court.
Based on all of the foregoing, we are of the opinion that this cause should be affirmed.
AFFIRMED.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and BOWLING, HAWKINS, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
WALKER, P.J., takes no part.