962 So.2d 46 (2006)
Rita M. HIGGINBOTHAM, Individually, and as Mother and Personal Representative of the Wrongful Death Beneficiaries of Heather Dawn Higginbotham, Deceased, Appellant,
v.
HILL BROTHERS CONSTRUCTION CO., INC., Hill Brothers Construction & Engineering Co., Inc., and Endevco, Inc., Appellees.
No. 2005-CA-00289-COA.
Court of Appeals of Mississippi.
December 12, 2006.
Rehearing Denied May 15, 2007.
*49 C. Kent Haney, Dana J. Swan, Clarksdale, attorneys for appellant.
Thomas W. Southerland, Michael N. Watts, Oxford, Todd Britton Murrah, attorneys for appellees.
EN BANC.
BARNES, J., for the Court.
¶ 1. This wrongful death action arose from an automobile accident that claimed the life of Heather Higginbotham on December 12, 1999. Rita Higginbotham, the administratrix of Heather's estate, appeals to this Court from the Tunica County Circuit Court's grant of summary judgments in favor of Hill Brothers Construction Co., Inc., Hill Brothers Construction & Engineering Co., Inc. (collectively "Hill Brothers"), and Endevco, Inc. Finding no error by the trial court, we affirm.

FACTS AND PROCEDURAL HISTORY
¶ 2. Heather, traveling south from Memphis to Clarksdale, lost control of her vehicle on Highway 61 in Tunica County after hitting a puddle that had formed in the roadway and was thrown from the vehicle when it subsequently flipped several times. Tina Read, an eyewitness to the accident, testified in her affidavit that Heather began to hydroplane when she hit the puddle that was located on what Read called both a "crossover" and "connecting road." Read was referring to what is known as a "temporary connector," which diverts traffic from a four-lane roadway to a two-lane roadway. At the time of the accident, two lanes were being added to Highway 61 to make it a four-lane highway from Clarksdale to Memphis. North of the temporary connector involved in this fatal accident, Highway 61 consisted of four lanes, but south of the accident scene there were still only two lanes. The temporary connector on which the puddle accumulated was moving southbound traffic from the two newly constructed lanes on the western side of the highway to the eastern two lanes that made up the original highway. A second temporary connector that was under construction at the time of the accident intersected with the existing temporary connector making an "X." It was designed to eventually move northbound traffic from the new western side of the highway to the old lanes on the eastern side of the highway while the old portion of Highway 61 *50 was being paved south of where the accident occurred.
¶ 3. In 1996 the Mississippi Department of Transportation ("MDOT") hired Endevco to construct an additional two lanes on Highway 61 from the point where Highway 4 intersects it down to the location of the temporary connector. Endevco was the prime contractor responsible for the construction of the temporary connector on which Heather hydroplaned. Endevco also repaved the original two lanes on this stretch of the highway. Endevco completed the work according to MDOT's specifications and was given its "Final Maintenance Release" on December 8, 1998. After inspecting the work done by Endevco, MDOT also gave formal notice to the company on September 20, 1999, that the project was satisfactorily completed and officially accepted. Lehman-Roberts Co. was the paving subcontractor for Endevco on the 1996 project and paved the temporary connector that was completed during that project.
¶ 4. In July of 1998, MDOT hired Lehman-Roberts as the primary contractor to pick up where Endevco's project ended and complete the construction of the two new lanes and repave the older roadway 11.7 miles down to the place where Highway 49 intersects Highway 61 in Coahoma County. Lehman-Roberts was responsible for the construction of the second temporary connector that intersected with the original temporary connector that Endevco had built.
¶ 5. Lehman-Roberts hired Hill Brothers Construction Co., primarily as a "subgrade" subcontractor. Hill Brothers was also responsible for drainage in connection with the second temporary connector. Although Higginbotham argues to the contrary, all evidence contained in the record reflects that Hill Brothers had absolutely no responsibility for the first temporary connector, which was the connector involved in Heather's fatal accident: Hills Brother did not construct or contribute in anyway to construction of the first temporary connector, and, the company was never responsible for ongoing maintenance or drainage of that connector.
¶ 6. Hill Brothers began working on the subgrade for the second temporary connector on November 29, 1999. "Subgrade" is the dirt and other granular material that make up the bottom layer of an asphalt road and establishes the grade or angle of the road. Hill Brothers constructed the subgrade for the second temporary connector and then topped it with a sandy material. Hill Brothers also bladed the clay gravel that Lehman-Roberts spread on top of the subgrade. By December 2, Hill Brothers had completed the subgrade and blade work on the second temporary connector. The record reflects that on December 3, a few Hill Brothers employees drained some water from the second connector as part of an effort to keep the connector in a condition to be paved. The second temporary connector was ready to be paved by December 4, but was not paved by Lehman-Roberts until January 11, 2000. According to the record, Hill Brothers did no work and was not otherwise present at the construction site from December 4 until well after the fatal accident occurred on December 12.
¶ 7. On December 10, 2002, Rita Higginbotham, the administratrix of Heather's estate, filed an amended complaint in the Circuit Court of Tunica County for the wrongful death of her daughter against multiple defendants, including Hill Brothers and Endevco. Higginbotham alleged that the negligence of Hill Brothers, Endevco and other defendants involved in the road construction process directly and proximately caused or contributed to the car wreck and eventual death of her *51 daughter. More specifically, Higginbotham alleged that the defendants were negligent in many respects including: failure to properly drain the temporary connector, failure to properly construct the temporary connector so as to prevent rainwater from ponding, and failure to warn the traveling public about an extremely hazardous condition about which they had actual knowledge. Hill Brothers and Endevco filed motions for summary judgment, which were granted by the trial court on November 17, 2004. Aggrieved by the result, Higginbotham perfected this appeal.

STANDARD OF REVIEW
¶ 8. A motion for summary judgment is properly granted "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). This Court reviews the grant or denial of summary judgment de novo. Saucier ex. rel. Saucier v. Biloxi Reg'l Med. Ctr., 708 So.2d 1351, 1354(¶ 10) (Miss.1998). We will consider all of the evidence before the lower court in the light most favorable to the non-moving party. Palmer v. Anderson Infirmary Benevolent Ass'n, 656 So.2d 790, 794 (Miss.1995). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Palmer v. Biloxi Reg'l Med. Ctr., Inc., 564 So.2d 1346, 1355 (Miss.1990).

DISCUSSION
I. ENDEVCO'S SUMMARY JUDGMENT
¶ 9. Endevco moved for summary judgment on the grounds that the "Final Maintenance Release" and official notice of acceptance given to it by MDOT prior to the accident shields it from liability to third parties. Higginbotham disagrees and alleges that Endevco did not meet MDOT specifications and that this negligence in constructing the connector caused ponding to occur on it during periods of heavy rainfall. Endevco does not dispute the fact that there was ponding on the connector it built, but instead argues that it constructed the connector using MDOT specifications and that, if ponding occurred, then MDOT should be held liable for negligently designing the connector. Endevco cites McKay v. Boyd Constr. Co., 571 So.2d 916 (Miss.1990), for the general rule that a contractor is not liable for work accepted by a public agency after it is accepted. Id. at 925 (quoting Holmes v. T.M. Strider & Co., 186 Miss. 380, 397, 189 So. 518, 522 (1939)). However, there is an exception to this general rule "in cases where the work is a nuisance per se, or where it is turned over by the contractor in a manner so negligently defective as to be imminently dangerous to third persons." Id. We turn now to a discussion of McKay and its applicability to the case sub judice.
¶ 10. McKay was a truly tragic case. Timothy McKay, a two-year-old boy, his mother, grandmother, brother, and sister were all traveling on U.S. Highway 49 in the summer of 1967, when their car began drifting slightly towards the left as the family approached the Strong River Crossing in Simpson County. Id. at 918. The McKay's automobile struck the concrete abutment, which was only twenty-three inches from the traveled portion of the road, and everyone except Timothy was killed instantly. However, he did not walk away from the accident unscathed, but suffered severe brain stem injuries which rendered him blind, incapable of speech, mentally incompetent, and totally dependent upon others for his care. Id.
*52 ¶ 11. In 1983, Timothy filed suit, through his guardian, alleging that the portion of the highway approaching the bridge was negligently constructed by Boyd Construction, Inc. in that it was overly pitched, causing vehicles to drift left from center toward the abutment. Further, Timothy argued that Boyd was negligent in failing to provide guardrails for the abutment and in constructing the abutment only twenty-three inches from the traversed portion of the road. Id. Boyd countered that it was not hired to construct guardrails, all specifications for the work it was contracted to do came from the Mississippi Highway Commission ("MHC"), which collected them from the Red Books published by the American Association of State Highway Officials ("AASHO"), and after completion and inspection of its work, the MHC granted Boyd a full, final release from all liability in 1963. Id. at 918-19. Boyd then filed a motion for summary judgment, claiming there were no genuine issues of material fact. Id. at 917. Timothy's response contained two affidavits, one asserting that it was not appropriate for the Strong River Bridge to have only a twenty-three inch clearance and another asserting that the bridge did not meet AASHO guidelines. After a hearing, summary judgment was granted in favor of Boyd. Id. at 919.
¶ 12. In affirming the lower court's grant of summary judgment, the supreme court stated:
[A]fter the contractor has turned the work over and it has been accepted by a public board or a commission as satisfactory, the contractor incurs no further liability to third parties, by reason of the condition of the work, and that the responsibility, if any, for maintaining or using it in its defective condition, is shifted to the public board or commission. This rule, however, is subject to some qualifications, among them the cases where the work is a nuisance per se, or where it is turned over by the contractor in a manner so negligently defective as to be imminently dangerous to third persons.

Id. at 925 (quoting Holmes, 186 Miss. at 397, 189 So. at 522). This language indicates that if the public board or commission conducts a detailed inspection and gives final approval of the work done, as evinced by a full and final release from all public liability or some similar declaration, then the contractor shall be deemed to have complied with those specifications supplied by the government agency that hired it to do the job. This interpretation of the language quoted above is reinforced by the language itself, as well as a sense of logic and justice.
¶ 13. First, the precedent itself states, "After the contractor has turned the work over and it has been accepted by a public board or a commission as satisfactory, the contractor incurs no further liability to third parties, by reason of the condition of the work. . . ." This makes no mention of the contractor having to comply with specifications of any kind, only that the government employer accepts the work as satisfactory, thus implying the contractor complied with given specifications. Therefore, the test of whether or not the contractor satisfactorily complied with the specifications is answered solely by the opinion of the government entity that provided it, evinced by its release. This reasoning is in line with McKay, though the issues surrounding that case focused more on the exceptions to the above rule rather than the rule itself. There, the supreme court was faced with one affidavit from Boyd's president stating that it had no part in the design of the bridge or its specifications, implying that Boyd did in fact comply with those specifications, and a second counter affidavit from Timothy *53 stating that Boyd had not complied with AASHO regulations, which was the source of the Highway Commission's specifications. McKay, 571 So.2d at 919, 923. Though the McKay court never explicitly found that Boyd complied with the Highway Commission's specifications, this finding is implicit in the following: "Notwithstanding the fact that Boyd had nothing to do with the design, planning or specification of the project, its work was approved and accepted by the highway commission. Moreover, based upon its inspections, the highway commission provided a full and final release from liability to Boyd." Id. at 925. From this point on the McKay court discussed the negligence exception to the rule with the understanding that Boyd had, in fact, "followed the guidelines and specifications provided by the highway commission." Id.
¶ 14. Secondly, logic would dictate that the government entity that sponsored the project, drew up and approved the specifications, inspected the completed work, fulfilled its pecuniary obligations, and provided the contractor with a full and final release of all further liability would stand in the best position to determine whether or not its own specifications were met. Whether the contractor followed given specifications would possibly be an issue if the contractor had not yet turned over the work, and not yet been brought under the protection of the rule above, but that is not the case here. Lastly, justice would also dictate that once a contractor receives a full and final release absolving it from future liability arising from the project, and placing the liability with the government entity that commissioned the work, some finality is deserving. Otherwise the release the contractor receives is nothing more than a piece of paper. For these reasons, we find that the issue of whether Endevco complied with MDOT's specifications is a decided, and thus a moot, point under the facts presented. That being said, we must now determine whether either of the exceptions apply.
¶ 15. The first exception concerns whether the work "is turned over by the contractor in a manner so negligently defective as to be imminently dangerous to third persons." In McKay, the supreme court was faced with a bridge constructed with no guardrails and abutments less than two feet from the traversed portion of the road. In addition, the supreme court had before it affidavits stating that the bridge was neither built within federal guidelines nor proper from a traveler safety standpoint. Given these dangers, the supreme court did not find them worthy of even a mention in regards to the "imminently dangerous" exception. This lack of discussion is revealing on the viability of this exception in that the following hazards apparently did not rise to the level of imminent danger: (1) the close proximity of the concrete abutments, (2) the lack of guardrails on those abutments, and (3) the previous two facts considered in light of the fact that the speed limit on this stretch of Highway 49 was sixty-five miles per hour. We find that the facts of this case do not even approach the apparent hazard that existed in McKay.
¶ 16. Two cases that have utilized the "contractor immunity" rule, and its corresponding exceptions, have found the question of whether the contractor turned over the work in a manner so negligently defective so as to be imminently dangerous to third persons to be a question for the jury. However, the facts of this case do not warrant the same treatment. In Holmes, a contractor was hired to rebuild and install an extra steel span across a bridge in Claiborne County. Holmes, 186 Miss. at 390, 189 So. at 520. After the contractor removed the hand or guardrail, wheel *54 guard, posts, and other essential items in preparation to replace them, the State Highway Department instructed the contractor cease all work and replace those items so that the bridge could be reopened to the public. Id. at 390-91, 189 So. at 520. The posts were put back, some bolted as before, some only nailed, but were spaced nineteen and a half feet apart, an increase from the seven or eight feet apart from where the posts were originally placed. The hand or guardrail was attached to the posts, and no further work was done on the guardrail until the accident that brought rise to the suit. Subsequently, the plaintiff/appellant was permanently injured when the car in which she was riding hit the guardrail and, after it gave way, fell off the bridge. Id., 189 So. at 520. The court reversed the trial court's grant of a peremptory instruction in favor of the contractor and ordered a new trial as to negligence by the contractor. Id. at 397, 189 So. at 523.
¶ 17. A second case in which the question of whether the exception applied was Monroe County Elec. Power Ass'n v. Pace, 461 So.2d 739 (Miss.1984). In Pace, a contractor was hired by a private business to build a molt press shed, and was instructed where and how to build the shed. Id. at 742. It so happened that the construction site for the shed was under high voltage power lines, which an employee of the private business, while working on the roof of the shed, came into contact with two years after its completion. The question of whether the contractor's action of building the shed underneath the power lines came within the exception went to the jury and it returned a verdict for the injured employee. Id. at 741. The supreme court simply affirmed the jury verdict. Id. at 748.
¶ 18. While these cases demonstrate that whether the exception applies may be a question of fact for the jury, we find that when assuming all facts favorable to the plaintiff in this case are true, the legal question is, was the connector "so negligently defective as to be imminently dangerous to third persons?" The record shows that Heather's fatal accident occurred on December 12, 1999. It had been raining all day. In fact, it had been raining the previous two days. In total, over the two days previous and the day of the accident, there had been three and a half inches of rainfall, two of which occurred the day Heather's accident occurred. With that much precipitation some amount of pooling or ponding must reasonably be expected by the motoring public. While not in the record, anyone who has driven on the streets, highways, and interstates of the State of Mississippi during, or immediately after, a rainstorm will see, and expect, pooling to some extent. It is not a totally unexpected event after it rains. Newspapers are replete with stories of motorists hydroplaning off state and county roadways. Temporary ponding of rainwater after a two inch rainfall on the connector, cannot be a condition so negligently defective as to be imminently dangerous to third persons so as to fall under the exception above. Imminently implies immediate, and the condition of the road in no way created an immediate danger. Rainwater ponding on the roadway is only dangerous at an unreasonably high rate of speed under the then existing conditions. This is not the case of erecting a building in which third persons may work on the roof dangerously close to high voltage power lines, as was the case in Pace. Neither is this the case of removing the safety features from a bridge, only to partially replace some of them in such a way so as to create a danger to any person who utilizes the bridge. The case before us involves pooling of water on a connector after three days of rain. Given the condition *55 of most, if not all, of the roadways in this state, those facts can hardly be considered as imminently dangerous.
¶ 19. The second exception that must be discussed is whether the work constituted a nuisance per se. According to the court in McKay, "as distinguished from negligence liability, liability in nuisance is predicated upon an unreasonable injury rather than upon unreasonable conduct." McKay, 571 So.2d at 921 (quoting 58 Am.Jur.2d Nuisances §§ 9-11 (1989)). "Any permanent, fixed, or stationary object or impediment, as distinguished from a mere temporary obstruction incidental to a lawful use of the way, which unreasonably and unnecessarily interferes with public travel or which endangers the safety of travelers constitutes a public nuisance per se." Id. (quoting 39 Am.Jur.2d Highways, Streets, and Bridges § 274 (1968)).
¶ 20. First of all, while Heather Higginbotham's fatal automobile accident was without question a tragedy, given the multiple days of rain and the corresponding surface conditions of the connector, an accident and subsequent injury can hardly be said to be unreasonable. Secondly, the "object" in question, ponding of rainwater, does not lend itself to classification as a public nuisance per se. In addition to the fact that ponding is not a "permanent, fixed, or stationary object," but only temporary by its very nature, an act of God cannot qualify as a nuisance, least not one for which Endevco should be held liable. The connector itself, in no way, restricted travel or posed any greater risk than any other average highway, street, or road in this state would after three and a half inches of rainfall. Therefore, we cannot find a genuine issue of material fact that either of the exceptions to contractor immunity applies to the instant case.
II. HILL BROTHERS SUMMARY JUDGMENT
¶ 21. The fact that Hill Brothers did not design or contribute in any way to the construction of the first temporary connector is not disputed. Consequently, any claim based on negligent design or construction is clearly inapplicable. With respect to Hill Brothers, Higginbotham argues on appeal that the company was negligent by failing to take affirmative action either to remedy or warn of the allegedly defective condition. Hill Brothers maintains that it cannot be held liable for the alleged wrongful death of Higginbotham's daughter because it was not responsible for the construction, maintenance or drainage of the original temporary connecting road. We find the argument advanced by Hill Brothers to be persuasive.
¶ 22. Higginbotham asserts on appeal that Hill Brothers "should have taken steps to correct [the] drainage problem," a problem which she claims contributed to the fatal accident. To support this contention, Higginbotham argues that Hill Brothers's 30(b)(6) representative, Danny Wilbanks, admitted in his deposition that Hill Brothers was responsible for the drainage of the temporary connector and the surrounding area. We find this to be a misinterpretation of the record as Wilbanks, in his deposition, specifically stated that Hill Brothers was responsible for the drainage of the subgrade it constructed for the second temporary connector. Wilbanks's entire deposition testimony was fairly clear that Hill Brothers was not responsible for drainage on or around the original connector. Wilbanks also stated in a subsequent affidavit that Hill Brothers was only responsible for drainage on its subgrade work. Moreover, according to the testimony of Lehman-Roberts's representative, Willy DeLoach, Hill Brothers had no responsibilities whatsoever with regard to *56 the original temporary connector. Higginbotham focuses on one line from Wilbanks's deposition, while ignoring all of his other testimony about drainage and his subsequent affidavit, and tries to turn that one line into an admission of responsibility for drainage on and around the first temporary connector. This is not a genuine factual issue; taken in context, the only reasonable interpretation of Wilbanks's testimony is that Hill Brothers was responsible only for drainage on the subgrade of the second temporary connector.
A. WHETHER HILL BROTHERS HAD AN AFFIRMATIVE DUTY TO TAKE REMEDIAL ACTION
¶ 23. Having failed to establish that Hill Brothers had any ongoing responsibility for the first temporary connector, Higginbotham is left only with her contention "that there was considerable construction by Hill Brothers in the very same area" to establish the company's affirmative duty to take remedial action. What is lacking in Higginbotham's argument, however, is any arguable basis for Hill Brothers's duty in light of the fact that Hill Brothers had no responsibility for the first temporary connector. Apparently, Higginbotham would have this Court place an affirmative duty upon Hill Brothers simply because the company was working in the area of the first temporary connector, and allegedly had notice of its propensity to accumulate water during periods of rain. Higginbotham has produced no authority which would place an affirmative duty upon Hill Brothers under the facts of this case.[1] To the contrary, our own independent research reveals that the Mississippi Supreme Court has expressly found no duty to warn under analogous circumstances.
¶ 24. In Jones v. James Reeves Contractors, Inc., 701 So.2d 774 (Miss. 1997), our supreme court acknowledged Mississippi's adherence to section 314 of the Restatement (Second) of Torts, which states that "the fact that an actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Id. at 784. This principle dictates that absent certain particular circumstances, there is no affirmative duty to aid or protect others. See, e.g., Evans v. United States, 883 F.Supp. 124 (S.D.Miss.1995) (construing Mississippi law in holding that doctor did not have duty to warn members of patient's family of patient's threats of violence); Long v. Patterson, 198 Miss. 554, 22 So.2d 490 (1945) (citing Restatement, Vol. 2 Torts, section 314 to support decision that minor, a passenger, did not have duty to warn tractor operator of oncoming traffic); White v. Rainbow Casino-Vicksburg P'ship, L.P., 910 So.2d 713, 719(¶ 19) (Miss.Ct.App.2005) (declining to establish duty of casino to render aid to patron in the absence of authority by Mississippi Supreme Court or by legislature); Cooper v. Missey, 881 So.2d 889, 893 (¶¶ 12-13) (Miss.Ct.App. 2004) (finding that there is no case law and no statute to establish social host's affirmative duty to render aid to a guest). Consequently, a finding that Hill Brothers *57 had no responsibility for the first temporary connector precludes a finding that Hill Brothers had a duty to warn of or remedy any dangerous condition  even assuming Hill Brothers knew of the condition.
¶ 25. In Jones, the issue was "whether there was a common law duty to warn on the part of the architects based upon their prior knowledge of the dangerous soil conditions." Jones, 701 So.2d at 784. There, the defendant architects were aware of the dangerous condition of the soil but did not warn construction crews of this condition. As a result, three men were trapped, suffocated, and killed when the walls of an excavation site caved in. Id. at 776-77. The Jones court stated that "[o]ne articulable reason in favor of holding the architect liable is that the status of the professional architect confers special duties upon him to warn the contractor and/or the contractor's employees due to the foreseeability of harm if no such warnings are given." Id. at 784 (citing Tarasoff v. Regents of the Univ. of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976) (psychiatrist treating deranged patient held liable to victim of patient's assault where doctor failed to warn victim of patient's ill intent toward him)). Stated differently, "because the architect knows of the danger and is in a position to take reasonable steps to prevent the harm, he must give a warning that would allow those in control to prevent harm to the worker." Id. Relying on section 314 of the Restatement (Second) of Torts, however, the Jones court expressly rejected this argument and found that the architects did not have a duty to warn of the dangerous soil condition. Id.
¶ 26. The supreme court in Jones held that, for the architects to have an affirmative duty, the architects would have had to take on the responsibility, "by contract or conduct," to maintain the safety of the construction project. Id. at 785-86. The holding in Jones and the application of section 314 of the Restatement (Second) of Torts leaves no alternative conclusion but that Hill Brothers had no affirmative duty with respect to the first temporary connector's propensity to accumulate water. There is simply no basis in law or fact to impose such a duty upon Hill Brothers. Hill Brothers did not own or occupy the connector, and there is no evidence that Hill Brothers undertook "by contract or conduct" to maintain the safety of the connector. To the contrary, the record clearly establishes that Hill Brothers was responsible only for drainage on the subgrade of the second temporary connector. Also, as will be shown, there is no evidence that the company either created or exacerbated the alleged defect. Consequently, Hill Brothers did not have an affirmative duty in this instance and therefore could not have breached any duty. Without proof of these necessary tort elements, Higginbotham failed to provide sufficient proof to withstand summary judgment.
B. WHETHER HILL BROTHERS HAD ACTUAL OR CONSTRUCTIVE NOTICE OF THE PONDING ON THE FIRST TEMPORARY CONNECTOR
¶ 27. Even assuming that Hill Brothers had an affirmative duty with respect to the first temporary connector, the record does not contain sufficient evidence to demonstrate that Hill Brothers had actual or constructive notice of the allegedly dangerous condition. While we acknowledge that circumstantial evidence is sufficient in many instances to create a factual dispute as to the proffered allegation, a jury would have to make very tenuous inferences, based on the circumstantial evidence contained in the record, to conclude that Hill *58 Brothers had notice of the ponding on the first temporary connector prior to December 12.
¶ 28. According to our supreme court, the "negligence of the defendant and notice to him may be found from circumstantial evidence of adequate probative value." Mississippi Winn-Dixie Supermarkets v. Hughes, 247 Miss. 575, 584, 156 So.2d 734, 736 (1963). Moreover, circumstantial evidence may be utilized to prove that a defective condition "was one of which the proprietor either had actual notice or the condition existed for such a length of time that, in the exercise of reasonable care, he should have known of it." Id. "However, the circumstantial evidence must be such that it creates a legitimate inference that places it beyond conjecture." Herrington v. Leaf River Forest Prods., 733 So.2d 774, 777(¶ 8) (Miss.1999) (citing Hardy v. K Mart Corp., 669 So.2d 34, 38 (Miss.1996)). While we acknowledge that a genuine factual dispute exists as to whether there was ponding on the first temporary connector, we find that there is no genuine factual dispute as to whether Hill Brothers had actual or constructive knowledge of the ponding.
1. Actual notice
¶ 29. Sammy Richardson, Hill Brothers's supervisor in charge of the second temporary connector, testified through affidavit that neither he nor any of his crew members ever saw any accumulation of water on the first temporary connector. Danny Wilbanks, Hill Brothers's 30(b)(6) representative, also testified in his deposition that he did not remember seeing any ponding on the first temporary connector. This is the only direct evidence of what Hill Brothers did or did not have notice.
¶ 30. As for circumstantial evidence, Tina Read, a passing motorist, testified by way of affidavit that she had "observed water on this section of the road on numerous occasions after it rained" and even stated that "every time it rained, water would stand on that road, or on that connecting road." While Read's testimony creates a factual dispute as to whether there was ponding on the connector, the mere existence of this fact  that the connector accumulated water when it rained  does not create a "legitimate inference . . . beyond conjecture" that Hill Brothers had notice of the ponding. Evidence contained in the record reflects that Hill Brothers generally did not work during periods of rain and wet soil conditions. Particularly, Hill Brothers did no work at the construction site from December 4 until well after the accident occurred on December 12, so Hill Brothers would not have been in a position to notice any ponding between these dates.
¶ 31. Although the record does establish that at least some Hill Brothers employees were at the construction site for very limited work on days when it had rained, the record also reflects that Hill Brothers had been working on an approximately 800-foot stretch of roadway prior to the fatal accident. There simply is nothing in the record to establish that Hill Brothers was in a position to witness the alleged ponding of the first temporary connector at any time prior to December 12. The inferential chain is simply much too weak to create a factual dispute based upon Read's affidavit, especially in light of the direct testimony of Hill Brothers's representatives that none of Hill Brothers's employees had seen any ponding on the first connector, MDOT representative Ulmer Bullock's deposition testimony to the effect that operations generally ceased during periods of rain and wet soil conditions and the undisputed MDOT diary entries reflecting Hill Brothers's absence from the construction area during periods *59 of rain between December 4 and December 12, 1999.
¶ 32. Similarly unpersuasive is the fact that on February 11, 2000, the MDOT inspector's diary indicated that Lehman-Roberts, the general contractor responsible for the ongoing project, reworked the median near the first temporary connector to alleviate ponding next to the temporary connector. This fact, while certainly indicative of a problem with the drainage in the median right next to the original connector, does not create a legitimate inference of notice to Hill Brothers because: (1) this remedial work was performed two months after the fatal accident and has no bearing on whether there was notice prior to the accident, and (2) even if notice could somehow be attributed to Lehman-Roberts based on this remedial work, there is no factual or legal basis to impute this notice to Hill Brothers, a subcontractor.
2. Constructive notice
¶ 33. As to whether Hill Brothers had constructive notice of the condition of the connector, there is evidence which tends to prove that the ponding condition existed for quite some time prior to December 12, 1999. The affidavit of Read is one such source of evidence. However, for Hill Brothers to be charged with constructive knowledge, a jury would have to find that "the condition existed for such a length of time that, in the exercise of reasonable care, [Hill Brothers] should have known of it." Hughes, 247 Miss. at 584, 156 So.2d at 736.
¶ 34. Constructive notice does not require any direct or circumstantial evidence of actual notice, but is instead a mechanism whereby the consequences of notice may be imposed without any proof that the accused had actual notice. Constructive notice may be asserted in situations where the accused has an affirmative duty to stay informed of the conditions associated with a particular piece of property. See id. In light of our previous finding that Hill Brothers had no responsibility for the first temporary connector, we find that the company could not validly be charged with constructive notice, as it would be inconsistent to assert that Hill Brothers should have been aware of an allegedly defective condition on a piece of property for which it had absolutely no responsibility.
3. Other evidence of notice
¶ 35. While an appellant certainly has a duty to bring to the Court's attention specific facts to support his argument, we are mindful of our duty to conduct a de novo examination of the record for any evidence that would preclude summary judgment. Consequently, we have examined the entire record for any evidence which would preclude summary judgment in favor of Hill Brothers. The following is a discussion of evidence that was not pointed out by Higginbotham, but which nonetheless might be construed as implying that Hill Brothers had notice of the ponding on the first temporary connector.
¶ 36. First, the December 3, 1999 foreman's report prepared by Prophet Giles, one of Lehman-Roberts's asphalt foremen, states that some Lehman-Roberts employees drained water off of a crossover. In his deposition, and pursuant to some confusion as to the difference between a "crossover" and "connector," Giles drew a diagram showing that a crossover is completely different from a connector, and testified that the work performed on December 3 involved draining water from a crossover "where we [were] working down the road . . . so we could lay asphalt on it." Furthermore, Giles specifically denied having to drain water from any connector. Even assuming, arguendo, that notice by *60 Lehman-Roberts may be imputed to Hill Brothers, this evidence does not establish notice of anything other than the accumulation of water on an unrelated, ongoing construction project.
¶ 37. Second, the December 3, 1999 Hill Brothers time sheet lists "Drain water on conn." as the work performed by Hill Brothers on that date. This entry loses all of its inferential value when read in light of Danny Wilbanks's deposition testimony. In his testimony, Wilbanks explained that the water drainage performed on December 3 was performed on the "connectors"[2] in an effort to get pools of water off of the clay gravel. According to Wilbanks, this was "standard practice, to get it off of the clay gravel." Both the Lehman-Roberts and Hill Brothers work records, along with the testimony of Giles and Wilbanks, mention water drainage in connection with ongoing work. We find that the propensity for water to accumulate on an unfinished, ongoing construction project does not in any way give notice that water is likely to accumulate on a section of pavement that, at the time of the accident and preceding, was complete and in all respects accepted by MDOT as safe for highway traffic.
¶ 38. Third, Jackie Tucker, a passenger in the decedent's vehicle at the time of the accident, testified in his deposition that as he was passing by the first temporary connector the day after the accident, he noticed "guys out there on backhoes digging trenches off the road to let the water run off." Nowhere does Tucker identify these "guys" as being employees of Hill Brothers. Moreover, Hill Brothers's time sheets, as well as MDOT's diary entries, reflect that Hill Brothers performed no work on this project between December 4, 1999 and January 17, 2000. Consequently, even if Rule 407 of the Mississippi Rules of Evidence did not make evidence of subsequent remedial measures inadmissible to prove negligence, Tucker's testimony is insufficient to create a genuine issue as to Hill Brothers's notice prior to the accident. These "guys" could have been employees of Lehman-Roberts, MDOT, or Tunica County, and the remedial measures could have been performed in response to the accident itself rather than in response to notice had prior to the accident.
¶ 39. Finding no direct evidence of Hill Brothers's actual or constructive notice and no "circumstantial evidence of adequate probative value" to establish same, we find that Higginbotham failed to present sufficient evidence of Hill Brothers's notice.
C. WHETHER HILL BROTHERS CONTRIBUTED TO OR EXACERBATED THE ALLEGEDLY DEFECTIVE CONDITION
¶ 40. Finally, although Higginbotham did not include an argument *61 or any authority with respect to the issue of whether Hill Brothers negligently caused or exacerbated the allegedly defective condition of the first temporary connector, we will briefly address this issue.
¶ 41. While there is ample evidence that Hill Brothers was working in the same area as the first temporary connector, nowhere does Higginbotham point out any negligent activity on the part of Hill Brothers that may have created or contributed to the alleged ponding on the first temporary connector. In fact, neither Higginbotham's summary judgment response nor her appellate brief assert that Hill Brothers was responsible for creating or contributing to the ponding. Instead, Higginbotham's entire argument with respect to Hill Brothers's negligence is that Hill Brothers failed to take remedial actionin the form of a warning or remedying the alleged drainage problemwhen, according to Higginbotham, the company had a duty to do so.
¶ 42. Even if we were to entertain an argument that Higginbotham did not advance in response to summary judgment and does not advance on appeal, the record contains no evidence to indicate that Hill Brothers either created or contributed to the first temporary connector's propensity to pond during periods of rain. First of all, it is not disputed that Hill Brothers did not contribute in any way to the construction of the first temporary connector, either as contractor or subcontractor. This fact absolves Hill Brothers of responsibility for any defects that existed at the time the first temporary connector was designed and constructed. This undisputed fact becomes even more probative in light of the affidavit of Tina Read, who testified that she traveled this "section of Highway 61 where the accident occurred . . . at least once a week from 1990 to 2003," and that "every time it rained, water would stand on that road, or on that connecting road," indicating that the ponding condition existed on the first temporary connector prior to Hill Brothers becoming a subcontractor on the second temporary connector. Additionally, Ulmer Bullock, III, the MDOT resident engineer associated with this particular construction project, testified in his deposition that "I'm not aware of ponding. I can't say as to what would have or wouldn't have caused it," Bullock's testimony therefore in no way points to any negligent conduct by Hill Brothers. The simple fact that Hill Brothers was performing work in the area, regardless of what that work entailed, is simply insufficient to create a factual dispute as to whether Hill Brothers created or exacerbated the allegedly defective condition.
¶ 43. Absent specific allegations and specific and detailed proof to support those allegations, there is no indication of which aspect of Hill Brothers's work was negligently performed, much less any evidence that would causally link any such negligence to the creation or exacerbation of the ponding on the first temporary connector. According to Danny Wilbanks, Hill Brothers area manager and 30(b)(6) representative, Hill Brothers "graded the opposite connector and placed the clay gravel for Lehman-Roberts. We placed the dirt by contract. We bladed their clay gravel when they leased the grader from us." Additionally, when asked whether or not any dirt had been hauled in, Wilbanks admitted that Hill Brothers had "hauled a little bar in." When asked whether Hill Brothers hauled any dirt "in there," Wiley Deloach, Lehman-Roberts 30(b)(6) representative testified that "I can't answer that." Deloach also testified that "Hill Brothers handled everything with the grades" on the second temporary connector and that Hill Brothers was responsible for drainage only on the second connector. *62 While it is within the realm of possibility that some of these activities were negligently performed and may have somehow contributed to the ponding on the first temporary connector, there is absolutely no evidence to indicate which activity was negligently performed, why such activity was negligent, nor how such negligence contributed to the ponding. Absent specific and detailed proof of these elements, there is no factual dispute as to this issue.

CONCLUSION
¶ 44. As to Endevco, we find that MDOT's acceptance of the company's work on the first temporary connector along with the full and final release given to Endevco effectively shifted the liability for the use and maintenance of the first temporary connector from Endevco to MDOT. Furthermore, neither of the two exceptions discussed in McKay apply so as to shift liability back to Endevco. We therefore find that the trial court properly granted summary judgment to Endevco.
¶ 45. With respect to Hill Brothers, we find that the company did not have a duty to warn of or remedy the allegedly dangerous condition posed by the first temporary connector. As we have concluded in a recent opinion, "This Court, while saddened by the loss of . . . life, cannot . . . stretch the duty of [a defendant] . . . to include a duty which our supreme court and Legislature have not deemed proper to establish." White, 910 So.2d at 719(¶ 19). Nevertheless, even if an affirmative duty did exist, the record contains insufficient evidence to create a factual dispute as to whether Hill Brothers had notice of the ponding on the connector prior to December 12. The inferences necessary to make such a conclusion are much too tenuous and would require the use of speculation and conjecture. This type of circumstantial evidence is simply not sufficient to defeat a motion for summary judgment. Lastly, although the argument was not advanced by Higginbotham at summary judgment or on appeal, we find that there is no evidence contained in the record to suggest that Hill Brothers created or contributed to the allegedly defective condition of the first temporary connector. Accordingly, we affirm the summary judgment in favor of Endevco as well as the summary judgment in favor of Hill Brothers.
¶ 46. THE JUDGMENT OF THE TUNICA COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
MYERS, P.J., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR. LEE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. KING, C.J., NOT PARTICIPATING.
LEE, P.J., Dissenting:
¶ 47. With respect to the majority, I find that genuine issues of material fact existed in regards to Endevco and Hill Brothers. Therefore, I dissent.
¶ 48. According to MDOT, the original temporary connector was constructed according to MDOT specifications and there was never any problem with ponding on it. Higginbotham disagrees and alleges that Endevco did not meet the specifications and that this negligence in constructing the connector caused ponding to occur on it during periods of heavy rainfall. Building a road, even a temporary road, where ponding occurs every time it rains a significant amount constitutes work "so negligently defective as to be imminently dangerous to third persons." McKay ex rel. McKay v. Boyd Constr. Co., 571 So.2d 916, 925 (Miss.1990). Endevco does not dispute the fact that there was ponding on *63 the connector it built, but instead argues that it constructed the connector using MDOT specifications and that, if ponding occurred, then MDOT should be held liable for negligently designing the connector.
¶ 49. The "genuine issue of material fact" between Higginbotham and Endevco is whether Endevco constructed the original temporary connector according to MDOT specifications. This factual issue is raised by the deposition testimony of Ulmer Bullock, III, the senior engineer supervising the Highway 61 construction project for MDOT. Bullock stated clearly in his deposition that any road constructed according to MDOT specifications would not have any ponding on it. Furthermore, he said that any road where ponding occurred would be unacceptable to MDOT. This factual issue is also raised by the affidavit of Tina Read in which she claims she saw puddles on the original temporary connector at the time of the accident and on several other occasions. The manner in which the fatal accident at the center of this case occurred also strongly suggests that hydroplaning was the cause of the accident: a one-car accident on a curving temporary connector during a time of significant precipitation. All of this creates a reasonable doubt regarding whether Endevco was negligent in complying with MDOT's specifications. This factual issue is material as well: whether or not Endevco constructed the connector according to specifications goes directly to its liability for the alleged wrongful death of Higginbotham's daughter.
¶ 50. In regards to Hill Brothers, the contract diary prepared by the MDOT inspector on February 11, 2000, which noted that Lehman-Roberts reworked the median drainage north of the original temporary connector to prevent water from ponding next to the temporary connector, also creates doubt about claims that no ponding was ever observed on the temporary connector. Although the diary mentions ponding next to, not on, the connector, it still leaves the impression that there was some problem with the drainage in the median right next to the original connector. If there was a problem with drainage in that part of the median, then a pool of water trapped in that part of the median, during a period of heavy rainfall, could have increased in size and crept up onto the original temporary connector. The majority contends that substantial rainfall which creates ponding on roadways is a common occurrence such that any accident resulting therefrom "can hardly be said to be unreasonable." However, the way in which Heather's accident occurred gives one the sense that this accident was caused by water that had collected on the temporary connector. There is no evidence or allegation that Heather was driving recklessly at an unreasonably high rate of speed as the majority implies.
¶ 51. Giving Higginbotham the benefit of all reasonable doubts, there is reason to believe that there was ponding on the original temporary connector on December 3, when it rained one and fourth tenth inches, and that the Hill Brothers employees draining water off the bladed gravel on the other connector that day observed this ponding. A Hill Brothers employee could have also observed ponding on December 4 when it rained eight tenths of an inch. This factual dispute is genuine because this evidence creates a reasonable doubt about whether Hill Brothers was on notice about the alleged ponding. The factual issue is material because it will resolve the issue of Hill Brothers's liability for the death of Higginbotham's daughter.
¶ 52. Finding that the motions for summary judgment granted in favor of Endevco *64 and Hill Brothers were premature, I would reverse and remand for a trial.
NOTES
[1] Higginbotham does not point out in her brief the source of the duty that Hill Brothers owed to the decedent. According to this Court, "It is well-settled law in this state that [the plaintiff] ha[s] the burden to show the following by a preponderance of the evidence: (a) a definable duty. . . ." White v. Rainbow Casino-Vicksburg P'ship, L.P., 910 So.2d 713, 718(¶ 15) (Miss.Ct.App.2005). Higginbotham does not assert that Hill Brothers's duty is based on premises liability, as Hill Brothers did not own the subject property, nor does she point out any other circumstances that would remove this case from the general rule stated in section 314 of the Restatement (Second) of Torts, discussed below.
[2] The record reflects that the particular highway project in question spanned more than eleven miles. There were three temporary connectors discussed or mentioned throughout the record. There were two connectors mentioned on the north end of the approximately eleven mile project: the old connector where the accident took place (first temporary connector), and the new connector on which Hill Brothers was performing the subgrade work (second temporary connector). In addition to these two connectors, Hill Brothers was also performing subgrade work on a connector on the south end of the project. This connector was several miles south of the north connectors. When Wilbanks refers to "connectors" in his deposition testimony, he is referring to the new connector on the north end of the project (second temporary connector) and the new connector on the south end of the project. Wilbanks expressly stated that Hill Brothers had no responsibility for building or maintaining the old north connector (first temporary connector), which is where the fatal accident took place.