IRVING, J.,
for the Court.
¶ 1. Rita M. Higginbotham (Higginbotham), the administratrix of Heather Higginbotham’s estate, filed a wrongful death action against Hill Brothers Construction Company (Hill Brothers), Endevco Company Inc. (Endevco), and Lehman-Roberts Company (Lehman-Roberts) on June 14, 2002, in the Tunica County Circuit Court. Endevco and Hill Brothers filed motions for summary judgments, and on November 23, 2004, the circuit court granted both motions. We affirmed the circuit court’s decision in Higginbotham v. Hill Brothers Construction Co., 962 So.2d 46 (Miss.Ct.App.2006) (Higginbotham I).
¶ 2. On August 31, 2007, Lehman-Roberts filed its motion for summary judgment, and on December 3, 2007, the circuit court granted the motion. Aggrieved, Higginbotham appeals and asserts that the circuit court erred in granting summary judgment in favor of Lehman-Roberts.
¶ 3. Finding no reversible error, we affirm.
FACTS
¶ 4. The underlying facts for today’s case are identical to the underlying facts in Higginbotham I. In Higginbotham I, we stated the facts as follows:
[On December 12, 1999,] Heather [Higginbotham], traveling south from Memphis to Clarksdale, lost control of her vehicle on Highway 61 in Tunica County after hitting a puddle that had formed in the roadway and was thrown from the vehicle when it subsequently flipped several times. Tina Read, an eyewitness to the accident, testified in her affidavit that Heather began to hydroplane when she hit the puddle that was located on what Read called both a “crossover” and “connecting road.” Read was referring to what is known as *523 a “temporary connector,” which diverts traffic from a four-lane roadway to a two-lane roadway. At the time of the accident, two lanes were being added to Highway 61 to make it a four-lane highway from Clarksdale to Memphis. North of the temporary connector involved in this fatal accident, Highway 61 consisted of four lanes, but south of the accident scene there were still only two lanes. The temporary connector on which the puddle accumulated was moving southbound traffic from the two newly constructed lanes on the western side of the highway to the eastern two lanes that made up the original highway. A second temporary connector that was under construction at the time of the accident intersected with the existing temporary connector making an “X.” It was designed to eventually move northbound traffic from the new western side of the highway to the old lanes on the eastern side of the highway while the old portion of Highway 61 was being paved south of where the accident occurred. In 1996, the Mississippi Department of Transportation (MDOT) hired Endevco to construct an additional two lanes on Highway 61 from the point where Highway 4 intersects it down to the location of the temporary connector. Endevco was the prime contractor responsible for the construction of the temporary connector on which Heather hydroplaned. Endevco also repaved the original two lanes on this stretch of the highway. Endevco completed the work according to MDOT’s specifications and was given its “Final Maintenance Release” on December 8, 1998. After inspecting the work done by Endevco, MDOT also gave formal notice to the company on September 20, 1999, that the project was satisfactorily completed and officially accepted. Lehman-Roberts Co. was the paving subcontractor for Endevco on the 1996 project and paved the temporary connector that was completed during that project.
In July of 1998, MDOT hired Lehman-Roberts as the primary contractor to pick up where Endevco’s project ended and complete the construction of the two new lanes and repave the older roadway 11.7 miles down to the place where Highway 49 intersects Highway 61 in Coahoma County. Lehman-Roberts was responsible for the construction of the second temporary connector that intersected with the original temporary connector that Endevco had built. Lehman-Roberts hired Hill Brothers Construction Co., primarily as a “sub-grade” subcontractor. Hill Brothers was also responsible for drainage in connection with the second temporary connector. Although Higginbotham argues to the contrary, all evidence contained in the record reflects that Hill Brothers had absolutely no responsibility for the first temporary connector, which was the connector involved in Heather’s fatal accident[.] Hill[ ] Brothers did not construct or contribute in anyway to the construction of the first temporary connector, and, the company was never responsible for ongoing maintenance or drainage of that connector.
On December 10, 2002, Rita Higginbotham, the administratrix of Heather’s estate, filed an amended complaint in the Circuit Court of Tunica County for the wrongful death of her daughter against multiple defendants, including Hill Brothers and Endevco. Higginbotham alleged that the negligence of Hill Brothers, Endevco[,] and other defendants involved in the road construction process directly and proximately caused or contributed to the car wreck and eventual death of her daugh *524 ter. More specifically, Higginbotham alleged that the defendants were negligent in many respects including: failure to properly drain the temporary connector, failure to properly construct the temporary connector so as to prevent rainwater from ponding, and failure to warn the traveling public about an extremely hazardous condition about which they had actual knowledge. Hill Brothers and Endevco filed motions for summary judgment, which were granted by the trial court on November, 17, 2004.
Id. at 49-51 (¶¶ 2-7).
ANALYSIS AND DISCUSSION OF THE ISSUE
¶ 5. It is well settled that in reviewing a trial court’s grant or denial of a motion for summary judgment, the standard of review is de novo. Todd v. First Baptist Church, 993 So.2d 827, 829(¶ 9) (Miss.2008) (citing Harmon v. Regions Bank, 961 So.2d 693, 697(¶ 10) (Miss.2007)). Pursuant to Rule 56(c) of the Mississippi Rules of Civil Procedure, a court shall grant summary judgment where “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” The evidence must be viewed in the light most favorable to the party against whom the motion has been made, and the moving party has the burden of demonstrating that no genuine issue of material fact(s) exists. Harmon, 961 So.2d at 697(¶ 10). The trial court’s decision to grant summary judgment will be reversed if there exists any triable issues of material fact. Todd, 993 So.2d at 829(¶ 9) (citing Harmon, 961 So.2d at 697(¶ 10)).
¶ 6. Central to the resolution of the issue before us is the fact that, as noted in Higginbotham I, Heather’s accident occurred on the first temporary connector. Higginbotham, 962 So.2d at 50(¶ 5). The primary contractor for construction of the first temporary connector was Endevco. Id. at (¶ 3). Endevco hired Lehman-Roberts as the subcontractor to do the paving on this connector. Id. The work on the first connector was completed on December 8, 1998, and officially accepted by the MDOT on September 20,1999. Id.
¶ 7. In Higginbotham I, this Court stated:
After the contractor has turned the work over and it has been accepted by a public board or a commission as satisfactory, the contractor incurs no further liability to third parties, by reason of the condition of the work, and that the responsibility, if any, for maintaining or using it in its defective condition, is shifted to the public board or commission. This rule, however, is subject to some qualifications, among them the cases where the work is a nuisance per se, or where it is turned over by the contractor in a manner so negligently defective as to be imminently dangerous to third persons.
Higginbotham, 962 So.2d at 52(¶ 12) (citing McKay v. Boyd Constr. Co., 571 So.2d 916, 925 (Miss.1990)).
¶ 8. Here, Lehman-Roberts relies on Higginbotham I and argues that although it was the subcontractor for the first temporary connector, it cannot be held liable for the accident occurring on that connector because this Court has already held that Endevco, the contractor, was not liable. In her brief, Higginbotham attempts to rebut this argument, asserting that Higginbotham I “only addressed the completed and accepted North project and that [Lehman-Roberts was] the general *525 contractor for the South Project,[1] which had not been completed at the time of the accident.” (Footnote added). Higginbotham further argues that Lehman-Roberts’s liability stems from Lehman-Roberts’s “failure to construct the intersection according to MDOT specifications and [its] failure to warn of a hazardous condition of which they [had] constructive notice.”
¶ 9. For the reasons that we now explain, we are not persuaded by Higginbotham’s argument that the circuit court erred in granting summary judgment in favor of Lehman-Roberts. In opposition to Lehman-Roberts’s motion for summary judgment, Higginbotham offered the affidavit of Tina Read, a fact witness, and excerpts from the deposition of Jackie Ray Tucker, another fact witness. She also offered the affidavit of Derek Barrentine, a licensed highway construction engineer, along with excerpts from Barrentine’s deposition, and excerpts from the deposition of Ulmer Bullock III, an engineer with the MDOT. We briefly discuss the factual allegations set forth in each of these documents.
¶ 10. In Read’s affidavit, she stated in pertinent part:
1. I am familiar with the section of Highway 61 where the accident occurred, as I made a round trip from Clarksdale, Mississippi to Memphis, Tennessee utilizing that road at least once a week from 1990 to 2003;
2. At the time of the accident, and the place of the accident[,] traffic on Highway 61 north of the accident was four lane, and traffic on Highway 61 south of the accident was two lane;
3. Traffic traveling [sic] from Memphis to Clarksdale at the accident scene crossed over from the southbound four[-]lane road onto the northbound two[-]lane road;
4. I observed water on this section of the road on numerous occasions after it rained. In fact, every time it rained, water would stand on that road, or on that connecting road;
5. On the day of the accident, I was approximately three car lengths behind Heather’s vehicle!,] and I saw her vehicle approach the crossover. As her vehicle entered the crossover, I saw water splashing[,] and it was apparent that she hit a puddle of water in the crossover;
6. After she hit the water, her vehicle immediately began to hydroplane!,] and she began to fishtail and lost control of her vehicle. I slowed down and continued to watch her vehicle as it traveled south. After hitting the water in the road[,] she was never able to regain control of her vehicle!,] and her vehicle ultimately flipped overt,] and she was thrown out of the vehicle.
¶ 11. In his deposition, Tucker stated that he was a passenger in Heather’s vehicle when the accident occurred and that at the time of the accident, they were on their way to Higginbotham’s house for dinner. He stated that it had been raining heavily for an hour or two prior to their leaving and that they had traveled approximately a mile before they arrived at the place where the temporary connector connected the four southbound lanes to the two northbound lanes. He stated that there was a dip in the middle of the connector that was holding water. We quote directly from Tucker’s deposition as follows:
*526 Q. What I’m actually trying to figure out is where in that temporary connector the water that y’all are saying the car hit was. Was it when you first entered the connector or in the middle of the connector?
A. It was in the middle.
Q. In the middle?
A. Yeah.
Q. Okay. So it wasn’t near the end where the connector spits you out on the two-lane [road]?
A. No, it was kind of in the middle.
¶ 12. Barrentine stated in his affidavit that “[i]t was foreseeable by Lehman-Roberts that a southbound vehicle would encounter the standing water in the ‘S-connector,’ hydroplane, and ultimately lose control of the vehicle [sic].” Additionally, Barrentine issued a written expert opinion wherein he contended that “Lehman-Roberts was negligent, in that [it] failed to recognize [s]tate and [fjederal guidelines for drainage and traffic control at the accident site, and [it] failed to complete construction in a timely manner. Failure to do so created an on-going hydroplane and edge drop-off hazard.” Barrentine further stated:
During construction of the new lanes in the south project, the southbound connector from the north project remained in use. According to MDOT daily reports around the time of the accident, a new co-located connector was also under construction. This would allow the newly constructed southbound lanes of the south project to be used for 2-way traffic during resurfacing of the original highway lanes on the same job. As both connectors would intersect in the median (creating an “X” at the center), additional fill material needed within the median raised the adjacent ground to within inches of the original [southbound] connector’s pavement elevation.
According to construction drawings and post-accident photographs by others, storm runoff between the normal crowns of the northbound and southbound lanes converged within the median and flowed [s]outh toward the intersecting connectors. The higher elevation of the southbound connector’s asphalt surface served to dam up approaching storm water along its north edge. Without proper drainage, rain would simply pond up at that location. (Reference MDOT lan/Profile Sheet at Station 1560, and ERC drawing “Drainage at Southbound Connector,” and ERC drawing “Section A-A at Southbound Connector,” and construction[-]site photos).
¶ 13. In his deposition, the following exchange occurred between Barrentine and counsel for one of the defendants:
Q. All right. What facts do you have to substantiate that Lehman-Roberts knew water stood on the connector?
A. I’m wanting to refer to one of the employee’s depositions. Right now I’m going to have to stop and go look for it again. Primarily[,] I’m looking at the fact that in the normal standard of care for construction companies who [sic] build roads on a continuous basis[,] they have to remain aware of potential problems like this and accommodate for them at that time. Understand [,] road hazards are created sometimes that are unavoidable but the important thing is to navigate traffic around it until they can subsequently fix the problem.
Q. What I want to know is, notice is an issue in this case, what I want to know is what facts do you have to substantiate that Lehman-Rob *527 erts was on notice of there being a water problem on the connector?
A. Can we stop and look?
Q. Sure.
A. Okay. I’ll need to look over some things if [sic] I can find it if it’s there.
⅜ ⅜ ⅜ ⅜ ⅜ :[:
Q. Mr. Barrentine, you looked through your file to refresh your memory. What facts do you have to substantiate that Lehman-Roberts had notice of the water on the connector?
A. First of all, I apologize for the delay. I’m not always aware of what questions you’re going to ask until I get here—
Q. Of course.
A. —so sometimes I have to go look. I was looking, what I was remembering was Darrey Williamsfs] deposition where he made reference to where he had seen the water numerous times. Of course he worked for MDOT so and what I was looking for was his reference to whether he had told Lehman-Roberts about the problem. He said he had not.
Q. Okay.
A. He did mention that they frequently run through the job site, the employees of Lehman-Roberts, would certainly have an opportunity of seeing it for themselves[,] but I don’t have anything on record that says they did.
(Emphasis added).
¶ 14. The final item offered by Higginbotham in opposition to Lehman-Roberts’s motion for summary judgment was a limited portion of Bullock’s deposition. Higginbotham points specifically to Bullock’s testimony wherein he admitted that “[i]f [water] was ponding it would indicate that we had a problem somewhere.” We should point out here that Bullock was quick to say that he was not aware of any ponding.
¶ 15. Higginbotham’s argument, as we understand it, is that although the south connector (where the accident occurred) had been completed and accepted by the MDOT, that fact has no bearing on Lehman-Roberts’s liability because Lehman-Roberts was the general contractor for the remaining portion of the project (the South Project) and that, as the general contractor, Lehman-Roberts was responsible for the safe passage of vehicles that were traveling through the construction zone. According to Higginbotham, the construction zone included the portion of the roadway containing the south connector because it provided the connecting link or access to the south project portion of the highway.
¶ 16. As stated, Higginbotham argues that there are genuine issues of material fact regarding Lehman-Roberts’s negligence, notwithstanding the fact that the accident occurred on that portion of the highway that was constructed by Endevco. Implicit in Higginbotham’s argument is that the southbound connector could not have been properly constructed because water would stand, stand, pond, or puddle in its middle section. However, she realizes that Higginbotham I foreclosed any chance of a recovery against Lehman-Roberts under this theory. Therefore, she takes her argument one step further, alleging that Lehman-Roberts is liable because it did nothing to prevent, or warn motorists of, the ponding even though it knew that the normal crowns of the northbound and southbound lanes allowed storm drainage to converge within the median and flow south toward the intersecting connectors. According to Higginbotham, the higher elevation of the southbound connector’s asphalt surface served to dam up approaching storm water along its *528 north edge. Without proper drainage, rain would simply pond up at that location. Higginbotham relies on Barrentine’s opinion that “[t]here was an opportunity for or there was water standing there in the gore that clearly could inundate a portion of the southbound connector and that doesn’t accommodate traffic as specified here [in regulatory guideline 104.04].” (Emphasis added).
¶ 17. While there is a dispute as to whether water ponded in the dip of the southbound connector where the accident occurred, there is no evidence that this ponding, if indeed it occurred, was caused by anything that Lehman-Roberts did or failed to do during its construction of the South Project and of the northbound connector. As stated, Higginbotham tries mightily to attach liability to Lehman-Roberts with her argument that Lehman-Roberts sat idly by and allowed water to accumulate in the gore of where the two connectors crossed. Assuming that this is the case, and we do not make that assumption, there still is not one scintilla of evidence that, at the time of the accident, water was flowing from the gore onto the southbound connector. Quite to the contrary, the controverted evidence is that there was a dip in the middle of the southbound connector and that this dip allowed water to pond or puddle when it rained.
CONCLUSION
¶ 18. Higginbotham I makes it clear that Lehman-Roberts’s liability may not be premised on faulty construction of the southbound connector. We have found nothing in Higginbotham’s response to Lehman-Roberts’s motion for summary judgment that raises a genuine issue of material fact regarding whether Lehman-Roberts’s dereliction of duty in the construction of the South Project was the proximate cause or a proximate contributing cause of Heather’s vehicle hydroplaning, which cost Heather her life. Therefore, we affirm the decision of the circuit court granting summary judgment for Lehman-Roberts.
¶ 19. THE JUDGMENT OF THE TU-NICA COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.

. The South Project included the construction of the second temporary connector.